IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

DEANA K. WILSON,

             Plaintiff,

   vs.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security
Administration

             Defendant.

CV 14–81–M–DLC-JCL

FINDINGS &
RECOMMENDATION

Deana Wilson brings this action under 42 U.S.C. § 405(g) seeking judicial review of the decision of the Commissioner of Social Security denying her application for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401-433.

## I.    <u>Procedural History</u>

Wilson filed a previous application for benefits in May 2002, alleging disability since July 1998 due to problems with her right hand and arm, and depression. (Tr. 96). That application was denied at all administrative levels, and in November 2005 this Court upheld the agency's decision. (Tr. 117-123).

In February 2008, Wilson filed a second claim for disability again alleging

disability since July 1998. (Tr. 161-62). Wilson's claim was denied initially, on reconsideration, and then by an ALJ based on the doctrine of res judicata. (Tr. 138-41). The Appeals Council granted Wilson's request for review, noting that Wilson had submitted new and material evidence relating to her alleged impairments. (Tr. 159). The Appeals Council remanded the case to an ALJ for further proceedings, and Wilson appeared with counsel at an administrative hearing on February 2, 2012. (Tr. 953-1053). On March 27, 2012, the ALJ issued a decision finding Wilson was not disabled within the meaning of the Act at any time on or before the expiration of her insured status on December 31, 2003.[1] (Tr. 42-62) The Appeals Council denied Wilson's subsequent request for review, making the ALJ's decision the agency's final decision for purposes of judicial review. (Tr. 8-12). Jurisdiction vests with this Court pursuant to 42 U.S.C. § 405(g).

Wilson was 41 years old at the time of her alleged onset date, and 55 years old at the time of the ALJ's decision.

---

[1] To qualify for disability insurance benefits, Wilson had to establish that she was disabled on or before December 31, 2003, the date she was last insured for disability purposes. In other words, Wilson had to establish that her impairments prevented her from performing any substantial gainful activity for twelve consecutive months beginning on or before that date. *See Flaten v. Sec'y. Health and Human Servs.*, 44 F.3d 1453, 1460 (9th Cir. 1995); *Morgan v. Sullivan*, 945 F.2d 1079, 1080 (9th Cir. 1991).

## II.    Standard of Review

This Court's review is limited.  The Court may set aside the Commissioner's decision only where the decision is not supported by substantial evidence or where the decision is based on legal error.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005); *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Widmark v. Barnhart,* 454 F.3d 1063, 1070 (9th Cir. 2006).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities."  *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).  This Court must uphold the Commissioner's findings "if supported by inferences reasonably drawn from the record."  *Batson v. Commissioner of Social Security Administration*, 359 F.3d 1190, 1193 (9th Cir. 2004).  "[I]f evidence exists to support more than one rational interpretation," the Court "must defer to the Commissioner's decision."  *Batson*, 359 F.3d at 1193 (*citing Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999).  This Court "may not substitute its judgment for that of the Commissioner."  *Widmark*, 454 F.3d at 1070 (*quoting Edlund*, 253 F.3d at 1156).

## III.    Burden of Proof

To establish disability, a claimant bears "the burden of proving an 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Batson*, 359 F.3d at 1193-94 (*quoting* 42 U.S.C. § 423(d)(1)(A)).

In determining whether a claimant is disabled, the Commissioner follows a five-step sequential evaluation process. 20 C.F.R. § 404.1520. The claimant bears the burden of establishing disability at steps one through four of this process. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). At the first step, the ALJ will consider whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If not, the ALJ must determine at step two whether the claimant has any impairments that qualify as "severe" under the regulations. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ finds that the claimant does have one or more severe impairments, the ALJ will compare those impairments to the impairments listed in the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the ALJ finds at step three that the claimant has an impairment that meets or equals a listed impairment, then the claimant is considered disabled. 20 C.F.R. § 404.1520(a)(iii). If, however, the claimant's impairments do not meet or equal the severity of any impairment described in the Listing of Impairments, then the ALJ

must proceed to step four and consider whether the claimant retains the residual

functional capacity (RFC) to perform his or her past relevant work. 20 C.F.R. §

404.1520(a)(4)(iv). If the claimant establishes an inability to engage in past work,

the burden shifts to the Commissioner at step five to establish that the claimant

can perform other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v).

## IV.    Discussion

The ALJ found at step one that Wilson met the insured status requirements

of the Act through December 31, 2003, and had not engaged in substantial gainful

activity since her July 3, 1998, alleged onset date. (Tr. 48). At step two, the ALJ

found that through the date last insured, Wilson had the following severe

impairments: fibromyalgia, Raynaud's phenomenon, and status-post right ulnar

nerve anterior transposition. (Tr. 48). The ALJ concluded at step three that

Wilson did not have an impairment or combination of impairments that met or

medically equaled any impairment described in the Listing of Impairments. (Tr.

48). The ALJ also found that while Wilson's "medically determinable

impairments could reasonably be expected to cause the alleged symptoms" her

"statements concerning the intensity, persistence, and limiting effects" of those

symptoms were not entirely credible. (Tr. 41). The ALJ found that Wilson was

capable of a limited range of light work, and could perform past relevant work as a

hospital admissions clerk or an insurance clerk. (Tr. 59-60). Alternatively, the ALJ found at step five that there were jobs in significant numbers in the national economy that she could have performed, including work as an information clerk, receptionist, or appointment clerk. (Tr. 61).

## A. Listed Impairments

At the third step in the sequential evaluation process, the ALJ must consider whether the claimant's impairment, or combination of impairments, meets or equals an impairment listed in 20 C.F.R. P. 404, Subpt. P, App. 1. "If the claimant meets or equals one of the listed impairments, a conclusive presumption of disability applies." *Marcia v. Sullivan*, 900 F.2d 172, 174 (9th Cir. 1990). To meet the requirements of a listing, the claimant "must have a medically determinable impairment(s) that satisfies all of the criteria in the listing." 20 C.F.R. § 404.1525(d).

To demonstrate medical equivalence, the claimant must have impairments, considered alone or in combination, that are "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404. 1526(a). The Ninth Circuit has made clear that the "ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment." *Lewis v. Apfel*, 236 F.3d 505, 512 (9th Cir. 2001). Nevertheless, the

burden remains with the claimant, who must present medical evidence that his impairments meet or medically equal all of the criteria of a listed impairment. *See Sullivan v. Zebley*, 493 U.S. 521, 531 (1990).

Wilson argues the ALJ erred at step three by failing to consider SSR 12-2p, which she claims sets forth a specific listing for fibromyalgia. (Doc. 19, at 36). As the Commissioner points out, however, SSR 12-2 did not become effective until it was published in the Federal Register on July 25, 2012 – four months after the ALJ's decision. SSR 12-2p, 77 Fed. Reg. 43,640 (July 25, 2012), 2012 WL 3104869.

Even if SSR 12-2p had been in effect at the time of the ALJ's decision, it does not create a specific listing for fibromyalgia. In fact, the ruling specifically states that fibromyalgia "cannot meet a listing in appendix 1 because [fibromyalgia] is not a listed impairment." SSSR 12-2p. The ruling thus instructs adjudicators to consider whether a claimant's fibromyalgia "equals a listing." SSR 12-2p. This is exactly what the ALJ did here. Noting there was no specific listing for fibromyalgia, the ALJ reviewed "section 1.00 which deals with musculoskeletal impairments and section 11.00 which deals with neurological disorders." (Tr. 49). The ALJ recognized that Wilson had been diagnosed with fibromyalgia, but found no marked limitation of motion and no severe loss of

function prior to her date last insured. (Tr. 49). The ALJ thus concluded that Wilson's fibromyalgia did not meet or equal the severity of requirements of Sections 1.00 and 11.00 of the Listing of Impairments. (Tr. 49). Wilson has not shown that the ALJ's analysis was flawed, and the Court finds that the ALJ's step three analysis is supported by substantial evidence.

### B.    Medical Opinions

Wilson argues the ALJ erred by not giving more weight to the opinions of treating physicians Dr. Bernadette Van Belois and Dr. Michael Righetti, and by relying instead on a Workers Compensation Insurance Medical Exam panel opinion provided by Dr. Catherine Capps and Dr. Lennard Wilson.

A treating physician's opinion is entitled to greater weight than that of an examining physician on the basis that he has a "greater opportunity to observe and know the patient." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). An examining physician's opinion in turn "carries more weight than a reviewing physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001). The weight given a treating or examining physician's opinion depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d)(2).

The Commissioner may disregard a treating physician's opinion whether or

not that opinion is contradicted. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th

Cir. 1989). To discount the controverted opinion of a treating physician, the ALJ

must provide "'specific and legitimate reasons' supported by substantial evidence

in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (quoting

*Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). The ALJ may accomplish this

by setting forth "a detailed and thorough summary of the facts and conflicting

clinical evidence, stating his interpretation thereof, and making findings."

*Magallanes*, 881 F.2d at 751. Similar standards apply to the ALJ's evaluation of

an examining physician's opinion. *Widmark v. Barnhart*, 454 F.3d 1063, 1066 (9th

Cir. 2006).

     1.   Dr. Van Belois

In June 1997, Wilson began experiencing right upper extremity symptoms

that interfered with her ability to perform data entry work. (Tr. 274). Wilson

participated in physical and occupational therapy, but eventually quit her job on

July 2, 1998. Wilson underwent surgery for ulnar nerve entrapment in January

1999, and participated in additional occupational therapy. (Tr. 324). In January

2003, treating physician Dr. Thomas Rickard referred Wilson to rheumatologist

Dr. Van Belois for further evaluation. Dr. Van Belois diagnosed Wilson with

fibromyalgia, prescribed medication, referred her to physical therapy, and

emphasized the importance of regular exercise. (Tr. 55, 678). Dr. Van Belois returned Wilson to her primary care physician, Dr. Rickard, for further care. (Tr. 55, 678). Dr. Van Belois next saw Wilson again in October 2004 for evaluation of Raynauds. (Tr. 675). Dr. Van Belois noted that Wilson continued to have fibromyalgia, though "her symptoms there seem to be tolerable," and also diagnosed her with CREST variant of scleroderma. (Tr. 675). Dr. Van Belois continued treating Wilson over the next several years, typically seeing her once every three to six months. (Tr. 653-730; 16-18).

On January 7, 2008, Dr. Van Belois wrote a letter in support of Wilson's application for benefits. (Tr. 656). Dr. Van Belois explained that she had diagnosed Wilson with scleroderma in October 2004, that Wilson had been experiencing Raynaud's phenomenon for about a year, and that Wilson had also "had inflammatory arthritis, GERD, sclerodactyly (tightening of the skin of the fingers), calcinosis (calcium deposits in the skin) and fatigue." (Tr. 656). Dr. Van Belois stated that in her medical opinion, Wilson was "disabled from gainful employment now and in the foreseeable future." (Tr. 658).

On March 21, 2011, Dr. Van Belois wrote a second letter on Wilson's behalf. (Tr. 894). Dr. Van Belois explained that she first saw Wilson on January

14, 2003, at which time Wilson had a "repetitive use injury to her right upper extremity and fibromyalgia." (Tr 894). Dr. Van Belois wrote that she believed Wilson "was disabled from gainful employment at that time due to these diagnoses." (Tr. 894).

The ALJ considered Dr. Van Belois' January 2008 and March 2011 letters, but gave them little weight in part because Dr. Van Belois had only seen Wilson once by the time her insured status expired on December 31, 2003.[2] (Tr. 56). As the ALJ noted, Dr. Van Belois first saw Wilson on January 14, 2003, and did not examine her again until October 2004 – ten months after the expiration of her insured status. (Tr. 56). The ALJ also pointed out that Dr. Van Belois' opinions were not consistent with her treatment notes, which were not indicative of any significant functional limitations. (Tr. 56). The ALJ discussed those treatment notes in detail, noting for example that when Dr. Van Belois first examined Wilson in January 2003 she prescribed physical therapy and emphasized the importance of physical activity. (Tr. 55). And as the ALJ also observed, when Dr. Van Belois examined Wilson in March 2005, she wrote that Wilson's Raynaud's

---

[2] Even assuming the ALJ erred by categorizing Dr. Van Belois as an examining physician (tr. 56) because she had only seen Wilson one time before the expiration of her insured status, any such error was harmless because the ALJ articulated sufficiently specific and legitimate reasons for rejecting her contradicted opinions.

was under good control and explained that Wilson's variant of scleroderma was of a mild variation and that she should do "pretty well" as long as she did not develop pulmonary hypertension. (Tr. 56). Dr. Van Belois' notes reflect that as of April 2006, Wilson still had not developed any pulmonary involvement. (Tr. 56). The ALJ reasonably found there was no evidence in Dr. Van Belois' medical records that Wilson's "Raynaud's or scleroderma would have reasonably been expected to cause physical work-related limitations before the expiration of her insured status in December 2003." (Tr. 56). The ALJ also found it significant that Dr. Van Belois made "no mention of restrictions in physical activity or work-related limitations secondary to [Wilson's] fibromyalgia" and, to the contrary, encouraged her to engage in physical activity and physical therapy. (Tr. 56). The ALJ reasonably declined to give Dr. Van Belois' opinion that Wilson was disabled great weight because it was conclusory, did not identify any specific restrictions, and because she "did not provide an opinion regarding her agreement or disagreement with the limitations that had already been set forth and agreed upon by multiple treating and examining providers." (Tr. 56).

The ALJ found it significant that "all other medical treating and examining providers agreed that [Wilson] could perform the jobs suggested in the July 1999

functional capacity evaluation" and no other medical provider placed more restrictive limitations on [Wilson] than Dr. [Michael] Righetti," who found in December 1999 that Wilson had no limitations in sitting, standing, or walking and could perform light work limited to a maximum of lifting ten pounds with the right arm, no repeat grasping with the right hand, and data entry activities not exceeding five to ten minutes at a time.  (Tr. 56, 375).  As the ALJ noted, for example, Dr. Michael Ricker opined in January 2004 that his office had not performed any formal work evaluation or imposed any formal work limitations, restrictions, or exclusions and had encouraged Wilson to engage in physical therapy and activities as tolerated.  (Tr. 55, 588).

The ALJ reasonably summed up his evaluation of Dr. Van Belois' opinions as follows:

> [E]ven if Dr. Van Belois were considered a treating source her opinion would not be entitled to controlling weight or even significant weight.  Prior to [Wilson's] date last insured, Dr. Van Belois had seen [her] on a single occasion and had no long-term examining or treating relationship.  Her opinion is not supported by or consistent with any treatment records from the claimant's other providers and examiners, who nearly universally agreed on [Wilson's] functional abilities, limitations and restrictions.  (Tr. 57).

The Court finds these were sufficiently specific and legitimate reasons supported by substantial evidence for rejecting Dr. Van Belois opinions as set forth in her

letters dated January 7, 2008, and March 21, 2011.

    2.    Dr. Righetti

To the extent Wilson argues the ALJ erred by not giving Dr. Righetti's

opinion more weight (doc. 19, at 19), she is mistaken. The ALJ gave Dr.

Righetti's opinion significant weight, limiting her to light work, which involves

frequent lifting or carrying of up to 10 pounds.[3] He also restricted Wilson to work

involving only occasional pushing and or pulling with the upper extremities, and

only occasional full extension reaching with the right upper extremity. (Tr. 50).

    3.    Dr. Catherine Capps and Dr. Lennard Wilson

Wilson argues the ALJ erred by relying on the Workers Compensation

Insurance Medical Exam panel opinion provided by Dr. Catherine Capps and Dr.

Lennard Wilson. Wilson maintains that because workers' compensation

proceedings are adversarial, the ALJ should be precluded from relying on medical

reports generated during those proceedings. (Doc. 19, at 7-8). But Wilson cites

no authority for the proposition that an ALJ may not consider medical opinions

provided during the course of state workers' compensation proceedings.

While the workers compensation and social security disability schemes are

---

[3] 20 C.F.R. § 404.1567(b).

different, it is well established that the ALJ may consider medical opinions provided during workers compensation proceedings in considering whether a claimant's is disabled within the meaning of the Social Security Act. *See e.g. Gonzales v. Colvin*, 2014 WL 7075300 *1 (C.D. Cal. Dec. 10, 2014); *Desrosiers v. Sec. of Health & Human Services*, 846 F.2d 573, 576 (9th Cir. 1988); *Coria v. Heckler*, 750 F.2d 245, 247-48 (3d Cir. 1984) (holding that ALJ erred by not considering medical reports submitted in state workers' compensation proceedings); *Carpenter v. Apfel*, 2000 WL 973681, at *3-4 (N.D. Cal. July 5, 2000) (concluding that examining physicians opinion as to the claimant's ability to work under state workers' compensation guidelines supported the ALJ's decision); *Payan v. Chater*, 959 F.Supp. 1197, 1203 (C.D. Cal. 1996).

Drs. Capps and Wilson performed a independent medical examination on October 20, 1999. (Tr. 322-30). They found no evidence of shift on provocative testing, instability tests were unremarkable, and impingement testing results were negative. (Tr. 52, 328). They diagnosed her with "overuse syndrome, right wrist, without clear evidence of a discrete syndrome" and "status post anterior submuscular transposition of the right ulnar nerve with minimal residual ulnar complaints." (Tr. 328). Drs. Capps and Wilson described Wilson as "pain

focused" and agreed with physical therapist Jay Shaver, who performed a functional capacity evaluation in July 1999, that Wilson was physically capable of working as a medical secretary, appointment scheduling, hospital admitting clerk or OB/ER clerk. (Tr. 310-21, 328-30).

The ALJ properly considered the report provided by Dr. Capps and Dr. Wilson during the workers' compensation proceedings in finding that Wilson was not disabled, and there is nothing to suggest that the ALJ somehow confused the workers' compensation system and the Social Security statutory scheme.

## C.   Credibility

Wilson argues the ALJ did not provide sufficiently clear and convincing reasons for discrediting her testimony. If the ALJ finds "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged," and "there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotation marks and citations omitted). Wilson met her initial burden because she provided evidence that she has underlying impairments that could

reasonably be expected to produce some degree of pain, and the ALJ did not find that she was malingering. As set forth below, however, the ALJ's decision sets forth sufficiently clear and convincing reasons for finding Wilson's subjective testimony only partially believable.

The ALJ's discussion reflects that he found Wilson not credible to the extent she claimed she was unable to work in large part because the medical evidence and opinions were not consistent with her allegations. The ALJ recounted Wilson's medical records in considerable detail, noting that physical examinations and medical testing between 1998 and 2003 resulted in mostly mild findings. (Tr. 50-56). The ALJ also found the fact that all but one of Wilson's treating and examining physicians agreed she was capable of returning to work with her recommended limitations undermined Wilson's allegations of disabling symptoms. (Tr. 58). The ALJ permissibly found that the medical evidence contradicted Wilson's allegations of disabling limitations, thereby calling her credibility into question.

The ALJ also cited inconsistencies in Wilson's statements as a basis for discounting her testimony. As the ALJ pointed out, for example, Drs. Wilson and Capps observed that Wilson's examination was "inconsistent between the two

examiners and with the same examiner performing similar and repeat tests throughout the examination." (Tr. 329). They stated that Wilson's examination was "diffuse and inconsistent when repeated over time today" and noted that "reading the chart in its entirety, it is clear that [Wilson] has claimed tenderness most everywhere on the arm but not consistently so." (Tr. 329). See SSR 96-7p ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record.").

The ALJ also noted throughout his discussion that Wilson had engaged in activities suggesting she was capable of doing more than she claimed. For example, the ALJ pointed out that although Wilson claimed she could not work she attended school to study accounting. (Tr. 53, 54, 373).

Finally, the ALJ found the fact that Wilson was not motivated to return to work not involving data entry undermined her credibility to the extent she claimed she was disabled. The ALJ cited a report by examining psychologist Dr. Edward Trontel, who found no clinically significant anxiety, depression, or other forms of psychopathology. (Tr. 356). Dr. Trontel observed that Wilson's approach to her impairment was marked by a somewhat black and white view and that she considered herself disabled if she could not return to the type of work she

envisioned. (Tr. 54, 354). In particular, the ALJ observed that Wilson was apparently unwilling to consider returning to work if she could not type 70 words a minute and refused an offer to return to work as a dietician assistant at North Valley Hospital. (Tr. 54, 354). *See e.g. Osenbrock v. Apfel*, 240 F.3d 1157, 1166 (9th Cir. 2001).

Read in its entirety, the ALJ's reasoning was sufficiently specific for this Court to conclude that he rejected Wilson's testimony on permissible grounds.

### D. Lay Witnesses

Wilson maintains the ALJ did not cite germane reasons for discounting the lay testimony of her husband, William, and written statements submitted by her sister, Fay Hagan, and children, Dani Jones and Myles Wilson.

It is well-established in the Ninth Circuit that the "ALJ must consider lay witness testimony concerning a claimant's ability to work." *Stout v. Commissioner*, 454 F.3d 1050, 1053 (9th Cir. 2006) (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 2003); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e)). "If the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness." *Stout*, 454 F.2d at 1053 (quoting *Dodrill*, 12 F.3d at 919). Competent lay witness testimony "cannot be disregarded

without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).

Nonetheless, the ALJ need not "discuss every witness's testimony on a individualized, witness-by-witness basis." *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th cir. 2012). "Rather, if the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness." *Molina* 674 F.3d at 1114. Moreover, "an ALJ's failure to comment upon lay witness testimony is harmless where 'the same evidence that the ALJ referred to in discrediting [the claimant's] claims also discredits [the lay witness's]claims.'" *Molina*, 674 F.3d at 1122 (quoting *Buckner v. Astrue*, 646 F.3d 549, 560 (8th Cir. 2011)).

Wilson's husband, William, testified at the administrative hearing as to his wife's limitations. (Tr. 1019-1029). He stated that Wilson would be unable to work because she cannot could not stand, sit, or lie down for any length of time, gets tired, has pain in her hands, and has to take a nap during the day. (Tr. 1020). The ALJ considered William's testimony, and in doing so recognized that Wilson's functioning had decreased over the years. (Tr. 58). But she gave William's testimony that Wilson would have been unable to work during the relevant period little weight because it was inconsistent with the opinions and

observations by medical doctors, nearly all of whom agreed Wilson could work and imposed limitations consistent with the ALJ's residual functional capacity assessment. (Tr. 57-58). This was a germane reason for discounting William's testimony. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005).

Wilson's daughter, Dani Jones, described the onset of Wilson's symptoms in 1999, explained that Wilson had to quit her job at North Valley Hospital as a result, and said that vocational rehabilitation had not been effective in helping her return to work. (Tr. 225). The ALJ permissibly rejected Dani's statement on the ground that it was not consistent with the opinions of her medical providers, or the fact that physical therapist Jay Shaver found Wilson capable of working as a medical secretary, appointment scheduler, and hospital admitting clerk. (Tr. 58).

In a letter dated August 29, 2008, Fay explained that Wilson's health had deteriorated since 1999, leaving her unable to engage in many of her prior activities. (Tr. 223). Wilson's son, Myles, similarly wrote in an undated letter that he had seen his 51 year old mother's condition deteriorate over the years.[4] (Tr. 227). Although he only saw her twice a year, he said she has a hard time doing chores and difficulty pushing a lawn mower. (Tr. 227). To the extent they

---

[4] Although the letter was undated, it was presumably written at some point in 2008, which is when Wilson would have been 51 years old.

described limitations greater than those included in the residual functional capacity assessment, the ALJ gave the two statements little weight because they described Wilson's condition well after the expiration of her insured status. Particularly in light of the fact that the ALJ accepted that Wilson's condition had deteriorated over time, he permissibly discounted these statements because they would have had little bearing on Wilson's condition prior to the expiration of her insured status some five years earlier.

### E.    Appeals Council

Wilson contends the ALJ failed to consider new and material evidence she submitted in support of her request for review to the Appeals Council. But the only evidence specifically identified by the Appeals Council is a September 2002 report from Dr. Richard, which the ALJ did in fact consider. (Tr. 53-54, 159, 406-07). The Appeals Council also referred to evidence suggesting that Wilson's fibromyalgia might be a severe impairment. The ALJ agreed based on his review of the evidence on remand that Wilson's fibromyalgia was in fact severe and Wilson has not shown how his evaluation of the medical evidence submitted to the Appeals Council was erroneous.

### F.    Vocational Expert

To the extent Wilson argues the ALJ erred by finding she was capable of performing past relevant work, the Commissioner agrees. The Commissioner notes that while the ALJ gave Dr. Righetti's opinion significant weight, the ALJ's residual functional capacity assessment did not restrict Wilson to only occasional fingering. (Tr. 375). Because the vocational expert testified that person limited to occasional fingering would be unable to perform Wilson's past relevant work, the Commissioner agrees the ALJ's step four finding was erroneous.

The Commissioner claims this error was harmless, however, because the ALJ made alternative findings at step five that included the grasping and handling limitations identified by Dr. Righetti and accommodated the lifting limitation. (Tr. 60-61). In response to a hypothetical question incorporating occasional handling and frequent fingering limitations consistent with Dr. Righetti's opinion, the vocational expert testified that a person would still be able to perform the sedentary information clerk job. (Tr. 1042).

Wilson also contends the vocational expert's testimony contradicted the Dictionary of Occupational Titles and maintains the ALJ erred by not resolving that contradiction. SSR 00-4p governs the use of vocational expert evidence in disability determinations, and states that "[o]ccupational evidence provided by a

VE...generally should be consistent with the occupational information supplied by the DOT." SSR 00-4p, * 2. If "there is an apparent unresolved conflict between VE...evidence and the DOT," the ALJ "must elicit a reasonable explanation for the conflict before relying on the VE" testimony to support a disability determination. SSR 00-4p, *2. An ALJ's failure to ask about a conflict is harmless if the record shows there is no conflict. *Massachi v. Astrue*, 486 F.3d 1149, 1154 n. 19 (9th Cir. 2007).

Here, the vocational expert's testimony did not contradict the DOT so any error on the ALJ's part in failing to ask about a conflict was harmless. The vocational expert testified that she understood a distinction between gross fingering and fine fingering. (Tr. 1042-43). She made clear that as described in the DOT, the information clerk job did not requires any fingering, gross or fine, and only occasional handling. DICOT 237.367-022, 1991 WL 672188. The vocational expert's testimony that a person with Wilson's limitations could perform the information clerk job was thus consistent with the DOT.

Finally, Wilson maintains the ALJ erred by not considering a report by Mark Schwager. (Tr. 948). Wilson submitted Schwager's report to the Appeals Council, at which point it was made part of the record. (Tr. 7). Where, as here,

evidence is made part of the record after the ALJ's decision, the Court must review the entire record, including the newly submitted evidence, to determine whether substantial evidence supports the ALJ's conclusion. *Brewes v. Commissioner of Soc. Sec. Admin.*, 682 F.3d 1157, 1162 (9th Cir. 2012). But the fact that Schwager's opinion was different from that of the testifying vocational expert does not mean the ALJ's decision was not supported by substantial evidence. As set forth above, the testifying vocational expert's opinion was consistent with the DOT and the ALJ's step five determination that Wilson could work as an information clerk is supported by substantial evidence.

## V.    Conclusion

For all of the above reasons, the Court concludes that the ALJ's decision is based on substantial evidence and free of prejudicial legal error. Accordingly,

IT IS RECOMMENDED that Wilson's motion for summary judgment be DENIED and the Commissioner's decision be affirmed.

DATED this 30th day of December, 2014

Jeremiah C. Lynch
United States Magistrate Judge